Polson Logging Company, a corporation, and M. B. Houston, Trustee in Dissolution of Polson Logging Company v. Commissioner.
Polson Logging Co. v. Commissioner
Docket No. 34813.
United States Tax Court
1953 Tax Ct. Memo LEXIS 409; 12 T.C.M. (CCH) 664; T.C.M. (RIA) 53208; January 11, 1953
*409 Lucien F. Marion, Esq., 1006 Hoge Building, Seattle, Wash., and Andrew M. Williams, Esq., for the petitioners. Douglas L. Barnes, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined a deficiency in income tax of the petitioner for 1947 in the amount of $14,501.03. Two issues are involved. One has been settled by stipulation. The issue remaining for decision arises under section 117 (k) (1) of the Internal Reveneu Code and relates solely to the fair market value on January 1, 1947, of certain timber cut by the petitioner during 1947. Findings of Fact Some of the facts have been stipulated, are so found, and the stipulation is adopted by reference. The petitioners are Polson Logging Company, a Washington corporation, and M. B. Houston, its trustee in dissolution. For convenience they will be hereinafter referred to in the singular as the petitioner. The petitioner's income tax return for 1947 was filed with the collector of internal revenue for the district of Washington at Tacoma, Washington. In that return the petitioner elected to invoke the provisions of section 117 (k) (1) of the Code *410 with respect to gain or loss upon the cutting of the timber here involved. In 1947 the petitioner was engaged in the business of logging its own timber and in operating a mill for converting logs into lumber in the Grays Harbor area in Western Washington. During that year the petitioner cut the following timber in Grays Harbor County, Washington, which it had owned in excess of six months prior to the beginning of the year: Douglas Fir
12,879 M feet
Spruce
1,312 M feet
Cedar
3,186 M feet
Hemlock
7,485 M feet
Pine
197 M feet
White Fir
7 M feet
Total
25,066 M feet
This timber was cut from three sites in the aforesaid county known as Camp 3, Camp 6, and Axford Prairie. The logs produced at these sites were transported to the petitioner's log dump in the Hoquiam River over the petitioner's private logging railroad. The weighted average railroad haul of the timber was 27 miles to the dump. This was an average haul for the industry. There the logs were rafted and towed about five miles to market. The average timber stand in the areas actually logged in 1947 was about 65,000 feet per acre. The timber was "clear cut" by the petitioner. In Western Washinton *411 and Oregon, Douglas fir is the most valuable of the various species of timber and the peeler grades, of which No. 1 peeler is the highest quality, have the greatest value. Of the 25,000 M feet (in round numbers) of timber cut by the petitioner in 1947 about 13,000 M feet (in round numbers) was Douglas fir. About 44 1/2 per cent of the Douglas fir was of peeler grade and about 30 per cent was No. 1 peeler. The petitioner's total logging costs incurred in its 1947 logging operations were $26.15 per M. If the timber had been purchased by others, such purchasers could have had it logged for three or four dollars less per M. The timber in question was a very high quality stand. It was susceptible of easy logging and the areas were accessible to the petitioner's logging railroad. Prior to November 10, 1946, sales of standing timber were subject to O.P.A. price ceilings. These ceilings were well below market value. They were removed on the named date. Thereafter, timber and lumber prices materially increased. The outlook for the lumber industry at the beginning of 1947 was good and there was a general feeling that purchasers of timber who could convert it into a manufactured product *412 within a couple of years could make a good profit. If the petitioner's timber had been put up for sale on January 1, 1947 it would have encountered an active, competitive market with the bidders including industries engaged in manufacturing pulp, shingles, plywood, and other forest products, financially able to handle deals involving substantial amounts. The principal bidders would have been manufacturing industries rather than independent loggers. Such bidders would have been able to bid higher for the timber than independent loggers. The petitioner, on its 1947 income tax returns, claimed the following values as of January 1, 1947, for species and amounts of timber cut during the year: M. Ft. Log
Aver. Market
Production
Value Per M.
Amount
Fir
12,879
22.46
$289,262.34
Spruce
1,312
20.29
26,620.48
Cedar
3,186
14.71
46,866.06
Hemlock
7,485
9.91
74,176.35
Pine
197
21.47
4,229.59
White Fir
7
9.76
68.32
Totals
25,066
$441,223.14
The respondent determined values in each instance to be as follows: M. Ft. Log
Aver. Market
Production
Value Per M.
Amount
Fir
12,879
15.11
$194,601.00
Spruce
1,312
9.38
12,306.56
Cedar
3,186
10.52
33,516.72
Hemlock
7,485
8.04
60,179.40
Pine
197
10.07
1,983.79
White Fir
7
8.24
57.68
Totals
25,066
$302,646.14
*413 The fair market value of the timber cut on January 1, 1947, was $400,000. Opinion The sole issue for decision is the fair market value on January 1, 1947, of the timber cut by the petitioner during the taxable year 1947. [1] This issue is disposed of by our ultimate finding of fact. *414 Extensive testimony by expert witnesses produced both by the petitioner and the Commissioner as to comparable sales and their opinions as to the fair market value of the timber cut on the crucial date appears in the record and we have been enlightened on the various theories of timber valuation and the factors generally considered by the experts in formulating such opinions. The record also embraces voluminous figures compiled by lumbermen's and loggers' associations dealing with timber sales and sales made by the United States Forest Service and the State of Washington. All of the evidence in the record, including the expert opinions, has been carefully considered and weighed in arriving at our ultimate conclusion. Although earnestly requested by the petitioner so to do, we perceive no useful purpose in here indulging in a detailed analysis of the evidence or a discussion of the valuation theories advanced. After all is said and done, "finding market value is, * * * something for judgment, experience, and reason on the part of the trier, and does not lend itself to dissection and separate evaluation." Colonial Fabrics, Inc. v. Commissioner, (C.A. 2) 202 Fed. (2d) 105, *415 affirming a Memorandum Opinion of this Court. Decision will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. * * *
(j) Gains and Losses From Involuntary Conversion and From the Sale or Exchange of Certain Property Used in the Trade or Business. - (1) Definition of Property Used in the Trade or Business. - For the purposes of this subsection, the term "property used in the trade or business" * * * also includes timber with respect to which subsection (k) (1) or (2) is applicable. * * *
(k) Gain or Loss in the Case of Timber or Coal. - (1) If the taxpayer so elects upon his return for a taxable year, the cutting of timber (for the sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than six months prior to the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. In case such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the adjusted basis for depletion of such timber in the hands of the taxpayer and the fair market value of such timber. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. If a taxpayer makes an election under this paragraph such election shall apply with respect to all timber which is owned by the taxpayer or which the taxpayer has a contract right to cut and shall be binding upon the taxpayer for the taxable year for which the election is made and for all subsequent years, unless the Commissioner, on showing of undue hardship, permits the taxpayer to revoke his election; such revocation, however, shall preclude any further elections under this paragraph except with the consent of the Commissioner. * * *↩